OPINION
{¶ 1} Defendant-appellant Milton Clyde Miley appeals his convictions and sentences from the Richland County Court of Common Pleas. Plaintiff-appellee is the State of Ohio. The following facts give rise to this appeal.
 {¶ 2} On February 10, 2005, an indictment was filed in the Richland County Court of Common Pleas charging Defendant-Appellant Milton Clyde Miley (hereinafter "Mr. Miley" or "appellant") with fifty-five (55) felony counts. The indictment, as subsequently amended, specifically charged appellant as follows:
 {¶ 3} Counts 1-5 Unlawful Sexual Conduct with a Minor in violation of R.C. 2907.04(A) (B)(3), felonies of the third degree (F-3), concerning alleged victim Lee Foster;
 {¶ 4} Counts 6-10 Disseminating Matter Harmful to Juveniles in violation of R.C. 2907.31(A) (3), felonies of the fifth degree (F-5), concerning alleged victim Lee Foster;
 {¶ 5} Counts 11-20 Corrupting Another with Drugs in violation of R.C. 2925.02(A) (4) (a), felonies of the fourth degree, concerning alleged victim Lee Foster;
 {¶ 6} Counts 21-30 Rape in violation of R.C. 2907.02(A) (1) (b), felonies of the first degree, involving alleged victim Scott Foster;
 {¶ 7} Counts 31-40 Unlawful Sexual Conduct with a Minor in violation of R.C. 2907.04(A) (B)(3), felonies of the third degree (F-3), concerning alleged victim Scott Foster;
 {¶ 8} Counts 40-45 Disseminating Matter Harmful to Juveniles in violation of R.C. 2907.31(A) (3), felonies of the fifth degree (F-5), concerning alleged victim Scott Foster;
 {¶ 9} Counts 46-50 Corrupting Another with Drugs in violation of R.C. 2925.02(A) (4) (a), felonies of the fourth degree, concerning alleged victim Scott Foster.
 {¶ 10} According to the indictment, the alleged incidents forming the basis of all 55 Counts occurred at appellant's residence at 625 Mansfield-Lucas Road, aka 3 Miley Lane, Mansfield, Ohio.
 {¶ 11} A nine-day jury trial was held on May 10-13 and May 16-20, 2005 before the Richland County Court of Common Pleas.
 {¶ 12} Following jury selection, and a jury view of appellant's home, the jury heard testimony from a total of twenty (20) separate witnesses and a total of over one hundred (100) exhibits.
 STATEMENT OF FACTS {¶ 13} Lee Foster was born on September 29, 1986. (T. at 87-89). Scott Foster was born almost three years later on May 28, 1989. (T. at 434-35). The Foster boys lived with their parents, Ed Foster and Angela Steven Foster, and their older brother, Drew, at 881 Brownwood Road in Mansfield. (T. at 89-90, 93-95, 434-35, 687-89). When they were still small boys, Lee and Scott Foster started hanging out at the nearby Milt's Quick Stop. (Id). Ed Foster regularly bought beer, and bought the boys pop and candy at Milt's Quick Stop. (Id). Milt's Quick Stop sells fishing and hunting licenses and, in 1998, it became an Ohio Department of Natural Resources, Division of Wildlife, check station for deer and wild turkey hunters to record their kills during those respective hunting seasons. (T. at 1126). Appellant, along with his sister Brenda Sikola, operated the store. (T. at 1125-26, 1150-51).
 {¶ 14} In the late 1990s, appellant began a lengthy remodeling project on his house, known as "3 Miley Lane," at the very end of his family's private street. (T. at 1151-54, 1208, 1230).
 {¶ 15} Lee Foster and Scott Foster began working on the remodeling project at Appellant's house. (T. at 722-24; 1231). Both boys indicated that the appellant paid them $25.00 per week to perform odd jobs and to help remodel his house. (T. at 95-104, 438-444).
 {¶ 16} Although neither of their parents smoked cigarettes, both Lee and Scott Foster started smoking cigarettes as pre-teens. (T. at 566, 724-25). Scott Foster was only ten years old when he began smoking. (Id.). The Foster boys smoked cigarettes before they began working for appellant. In addition Lee Foster began smoking marijuana in June, 2002, with his friend Eric Hall. (T. at 123-25).
 {¶ 17} In August, 2003, the boys' parents were divorced. Their mother, Angela Stevens Foster, retained custody of the boys. (T. at 695-96). Appellant renovated a rental house on his property for the boys' mother. (T. at 511-12). She moved into that home and lived there for several months during the latter half of 2004.
 {¶ 18} Ed Foster claimed to be surprised by his wife Angela asking for a divorce, and wondered if appellant had anything to do with it. (T. at 703-07). On October 18, 2002, after talking to his sister and finding out that Appellant had invited his son Scott to a movie during the summer of 2002, Mr. Foster filed a report against appellant with Richland County Children's Services. (T. at 703-7; 758-71; 802-3).
 {¶ 19} During the investigation that ensued worker Anne Mathis of Richland County Children Services separately interviewed all three Foster boys — Drew, Lee, and Scott and their mother Angela Stevens Foster on October 29, 2002. All three Foster boys denied being involved in any kind of sexual activity with appellant, and described him as being just a close family friend. (Id). They also denied receiving any expensive gifts from appellant. (Id). Scott Foster explained that he merely had use of appellant's cell phone, that his mother paid for the airtime, and that the boys rode appellant's four-wheelers, or quads, when they visited his house. (Id). Angela Stevens Foster told the social worker that appellant was just a close friend of the family. (Id).
 {¶ 20} Appellant cooperated fully with the Children's Services investigation, and was interviewed by Anne Mathis at Milt's Quick Stop on November 8, 2002. (T. at 789-92). Appellant denied that anything inappropriate was going on between him and any of the three Foster boys, and denied giving them expensive or inappropriate gifts. (Id). Instead, appellant described himself as a family friend of the Foster boys and a friend of their mother. (Id). Based on her investigation, Anne Mathis issued a report dated November 8, 2002 in which she concluded that Ed Foster's allegation against appellant was "unsubstantiated" and that no charges would be filed. (T. at 797, 809-10, 812-13).
 {¶ 21} On the night of May 14, 2004, Scott Foster stole appellant's Ford Explorer SUV and went joyriding. (T. at 245-47, 496-99, 611-12). Scott Foster led Ohio State Highway Patrol troopers on a twenty-three (23) mile chase on 1-71 northbound into Ashland County, reaching speeds of over 100 M.P.H. before the troopers stopped the SUV using road spikes. Scott Foster was charged in Ashland County Juvenile Court with felony fleeing and eluding and entered a plea to that charge. (T. at 245-47; 930-33).
 {¶ 22} While that felony juvenile case was pending, Scott Foster accidentally discharged his brother, Lee Foster's shotgun inside their mother's apartment causing damage to the apartment door and to the door of the neighbor across the common hallway. (T. at 247-48, 499-500, 502-05, 612-13). In late September of 2004, Scott Foster went to the Richland County Juvenile Court on both matters, where he was sentenced to a suspended commitment to the Ohio Department of Youth Services (ODYS) and placed on probation. (T. at 607-08, 930-33, 946-47, 952-53)
 {¶ 23} On the night of January 21-22, 2005, Lee Foster and Scott Foster drank beer and played cards with their father, Ed Foster, and new stepmother Pam. (T. at 203-05, 235-36, 268-77, 29397, 300-01, 608-11). After their father and stepmother went to bed, both Lee and Scott Foster sneaked out of the house to go driving around in Lee's truck and smoke marijuana together. (Id). Due to his intoxicated state and the poor winter road conditions, Lee Foster drove his truck off of Possum Run Road into a culvert near his home. (Id). When the crash occurred, Scott Foster was in the passenger seat packing marijuana into bowl for the two boys to smoke. (Id). Thus, Scott was in violation of his juvenile court probation for drinking alcohol, being out past curfew, and possessing marijuana and drug paraphernalia. (T. at 608-11, 952-53).
 {¶ 24} Lee Foster was arrested on January 22, 2005 and charged with eight misdemeanor criminal and traffic violations including: OVI, underage possession of alcohol, possession of marijuana, drug paraphernalia, weapons under disability, improper transport of a firearm, failure to control, and a seatbelt violation. (Id). Lee Foster later pleaded guilty to the OVI charge and to two amended counts of disorderly conduct, with the remaining five charges — including both firearm charges — being dismissed. (T. at 270-77, 933-38, 940-46; Defense Exhibit D). Lee Foster was sentenced to only a three-day OVI driver's program and fines. (Id.).
 {¶ 25} On the Monday morning, November 15, 2004, Lee Foster told his father, Ed Foster, that Scott Foster was being sexually molested by appellant. (T. at 196-99, 250-51, 590-91, 709-12, 742-43). However, Lee never said anything to his father at that time about being allegedly sexually molested himself. (Id).
 {¶ 26} Ed Foster reported his son Lee Foster's allegations against appellant to Richland County Children' Services. (T. at 710-15).
 {¶ 27} During the late afternoon and early evening of November 16, 2004, Detective Sergeant Jeff McBride and Matt Keck, a Children's Services investigator, interviewed Scott Foster and Lee Foster separately, and then together, at their father's home on Washington Street South. (T. at 820-23, 846-47, 1006-07, 1040-43). Lee and Scott Foster provided descriptions of pornographic videocassettes possessed by Appellant at his home. (T. at 253-54, 283-84, 633-35, 851-52, 1043-48; State's Exhibit 70 at p. 3).
 {¶ 28} The appellant first approached Scott Foster about engaging in sexual activity when Scott was eleven years old. On that occasion, appellant paid Scott $185.00 in exchange for Scott showing appellant his penis and allowing appellant to perform oral sex upon him. Lee Foster testified that appellant also sexually abused him. Both boys testified that they watched pornographic movies with appellant at his house. Further, the boys testified that appellant would supply them with alcohol, cigarettes and marijuana.
 {¶ 29} On November 17, 2004, Sergeant McBride obtained a search warrant for appellant's house from Judge Payton of the Mansfield Municipal Court. (T. at 1008-10). Later that same afternoon, Sgt. McBride and other Richland County Sheriff's Deputies executed that search warrant at appellant's home at 3 Miley Drive. (T. at 882-902, 917-18, 1009-22, 1049-51). Captain Daugherty of the Sheriffs Department, who was in charge of processing the alleged crime scene, took 80 to 100 "virgin photographs" photos of the inside of appellant's home before any items were allegedly touched or seized by the sheriff's deputies. (T. at 884-899). The items seized by Sheriffs Deputies from appellant's home included the following:
(1) three firearms;
(2) twenty-one pornographic VHS videocassettes, all but four of which were found inside a metal cabinet in the Harley-Davidson room of Appellant's home (State's Exhibits 13-31, 35, and 47);
(3) marijuana weighing a total of 7.413 grams, or approximately one-quarter (1/4) ounce (State's Exhibits 8, 32, 43, and 57);
(4) multiple scales and smoking devices, which Sheriffs Deputies believed to be drug paraphernalia (State's Exhibits 1-7, 9-12, 38, 44-45);
(5) various sex toys, including dildos and vibrators, found inside a bathroom closet (State's Exhibits 33-34, 38-39);
(6) two sheets from Appellant's bed in the master bedroom (State's Exhibits 40-41); and
(7) a blue couch cushion from the living room (State's Exhibit 46).
 {¶ 30} (T. at 887-906, 1066-70).
 {¶ 31} A SANE (Sexual Assault Nurse Examiner) medical exam was subsequently conducted on Scott Foster for signs of sexual abuse, which came back negative for any signs of anal intercourse or anal trauma alleged by Scott Foster. (T. at 856-59, 873-74, 1062-64; State's Exhibit 70 at 2). There was no DNA evidence, or any other physical evidence to support Lee Foster's allegations.
 {¶ 32} The trial court, over defense counsel's objection, permitted the State to introduce appellant's 1994 conviction on five counts of gross sexual imposition with a minor, Jeb Weikle. The court further permitted Scott Foster to testify that the appellant told Scott's mother about his prior conviction, but claimed that he was innocent. (T. at 550). Scott stated that as time went on, the appellant admitted that he had performed oral sex on Jeb Weikle. (T. at 550-51).
 {¶ 33} The appellant told Scott that he purchased a Geo Tracker for Jeb with his name on the license plate. (T. at 551). The Appellant also said that he purchased a boat and docked it next to the Weikle family's boat on Lake Erie. (T. at 551). The appellant told Scott that on one occasion while they were going to the lake, he was masturbating Jeb while they were driving in the Tracker. When Jeb's family drove past them, he pulled off to the side of the road and performed oral sex on Jeb. (T. at 551-552).
 {¶ 34} Scott testified that he has never met anyone by the name of Jeb, and that he never talked to anyone from the Weikle family. (T. at 552). He also indicated that the prosecutor's office did not give him any information about the Appellant's prior case. (T. at 552).
 {¶ 35} The trial court also permitted the testimony of the minor victim in appellant's previous case, Jeb Weikle, to testify. Jeb testified that he became acquainted with the appellant in 1990 when the Appellant bought Christmas presents for the children in his family. (T. at 558). Like Lee and Scott Foster, Jeb indicated that he and his brother Jeremy worked for the Appellant, doing jobs such as cleaning, mowing, and snow plowing. (T. at 959-60).
 {¶ 36} In the late spring of 1991, the appellant purchased a boat and docked it next to the Weikle family's boat on Lake Erie. (T. at 960-962). Jeb testified that the appellant also brought four jet skis up to the lake and allowed the Weikle children to ride them. (T. at 964-65). At some point during the summer, Jeb testified that the appellant had a conversation with his parents about allowing him and Jeremy to sleep on the appellant's boat. (T. 966-67). Jeb indicated that he and his brother spent the night on the appellant's boat on July 13, 1991, his twelfth birthday. (T. at 967-69). During the night, he woke up with the appellant performing oral sex on him. (T. at 969). The next morning, the Appellant told Jeb that if he said anything, they would both get in trouble. (Id.). Jeb testified that he did not tell his parents what had happened because he was embarrassed and scared. (T. at 970).
 {¶ 37} After the incident on the boat, Jeb and his brother continued to work for the Appellant. (Id.). During that time period, Jeb testified that the appellant bought a Geo Tracker with the license plate "6 Jeb" or "Jeb 6." (T. at 970-971). The Appellant also bought Jeb a four-wheeler when he was twelve years old. (T. at 971-972). Jeb indicated that he was not allowed to take the four-wheeler home with him, and was only allowed to ride it with the appellant. (T. at 972). Scott Foster testified to a similar purchase of a four-wheeler by appellant and conditions of use in the case at bar. (T. at 484-86). Jeb also testified that the appellant bought him a dirt bike and a game boy. (T. at 972-73).
 {¶ 38} During the summer of 1991, Jeb indicated that he spent almost every weekend on the appellant's boat, and every weekend, the appellant would perform oral sex on him. (T. at 973). During that time, the appellant would also take him on mowing jobs, where the appellant would perform oral sex on him in the trailer used to haul the mowers. (T. at 973-74). Jeb testified that when he was cleaning businesses for the appellant, the appellant would send his brother to another area of the business and would perform oral sex on him. (T. at 975). This conduct continued through the summer of 1993. Jeb testified that between the summer of 1991 and 1993, the appellant engaged in oral sex with him between 300 to 400 times. (T. at 980).
 {¶ 39} Jeb testified that the molestation ended in the summer of 1993 after an incident at the lake. He stated that he and his brother stayed out late with friends. When they returned to the appellant's boat, he got angry and began yelling at them. (T. at 978). Jeb's parents heard the argument and intervened. When his parents asked if anything was going on, Jeb confided in them about the molestation. (T. at 980). Thereafter, Jeb Weikle testified on re-direct examination that the appellant was convicted for molesting him. (T. at 998).
 {¶ 40} Detective Jeff McBride of the Richland County Sheriff's Department also testified regarding the appellant's prior conviction. He identified State's Exhibit 66 as a sentencing order from the Richland County Court of Common Pleas in Case No. 94-CR-440H. (T. at 1037). He indicated that State's Exhibit 66 was a certified copy of the appellant's conviction in the Jeb Weikle case. (T. at 1037).
 {¶ 41} Detective McBride also testified regarding the similarities between the Jeb Weikle case and this case involving Lee and Scott Foster. He indicated that in both cases, the victims had blonde hair and blue eyes. (T. at 1031). All of the boys came from somewhat dysfunctional families where there was divorce or separation. (T. at 1031). Detective McBride also indicated that the appellant formed friendships with the victims and their families, and supplied four-wheelers and/or jet skis. (T. at 1031). In addition, he indicated that there were similarities in terms of work opportunities offered to the victims. (T. at 1031).
 {¶ 42} Despite objections by defense counsel, Ed Roof was also permitted to testify regarding prior instances of sexual abuse by the appellant. Mr. Roof testified that he spent a lot of time with the appellant as a juvenile in the early 1990's. During that time, he would drink and smoke marijuana with the appellant. (T. at 650-52). He indicated that the appellant would occasionally try to grope him, and on one occasion the appellant performed oral sex on him. (T. at 652-53). Mr. Roof also testified the Appellant showed him pornographic movies as a juvenile. (T. at 662). Mr. Roof further admitted to selling appellant marijuana and to his smoking marijuana with appellant and the Foster boys. (T. at 655-58). Mr. Roof further admitted that he was convicted of corrupting another with drugs as a result of his conduct. (Id. at 658). In exchange for his plea and his testimony in appellant's case, Mr. Roof was given a deal by the State which did not include incarceration. (Id. at 658-59; 676-678).
 {¶ 43} On May 20, 2005, the jury returned a verdict of guilty as to all fifty-five (55) counts of the indictment. (T. at 1409-12).
 {¶ 44} On May 31, 2005, the trial court sentenced appellant to a total prison term of thirty-five (35) years. (T. at 1416-28). The trial court further found appellant to be a sexual predator under R.C. Chapter 2950. (T. at 1416-28). Appellant thereafter filed a timely notice of appeal to this Court in Case No. 05CA67.
 {¶ 45} On September 16, 2005, appellant filed a motion for new trial based upon newly discovered evidence after trial that alleged victim Lee Foster had lied twice under oath on cross-examination, when he denied stealing a firearm from his paternal Aunt Linda MacFarlane's house. (T. at 265). Mrs. MacFarlane herself had incorrectly testified that there was never a problem with her nephew Lee Foster removing or stealing anything from her home. (T. at 773-74). After trial, Mrs. MacFarlane approached Prosecutor James J. Mayer, Jr., at a Chili Cook-Off in Mansfield and told him that her husband was indeed missing a firearm. (New Trial Motion T. at 29-30). Based on that information, Lee Foster was interviewed by Detective Sergeant Jeff McBride of Richland County Sheriff's Office and admitted to stealing his Uncle's firearm. (New Trial Motion T. at 3031, 37-39). Lee Foster was subsequently charged with felony theft of a firearm, convicted of that felony offense, and placed on diversion. (New Trial Motion T. at 31-32). The State of Ohio filed a memorandum in opposition to Appellant's motion for new trial.
 {¶ 46} On December 21, a hearing on Appellant's motion for new trial was held before the trial court. The trial court heard testimony from three witnesses: Lawrence Courtney, who was one of Appellant's trial attorneys; James J. Mayer, Jr., the Richland County Prosecuting Attorney; and Detective Sergeant Jeff McBride of the Richland County Sheriff's Office. (New Trial Motion T. at 8-47). After hearing the testimony and receiving the two defense exhibits, the trial court took the matter under advisement. (New Trial Motion T. at 52-53). On January 11, 2006, the trial court denied appellant's motion for new trial. Appellant thereafter filed a timely notice of appeal to this Court in Case No. 06CA14.
 {¶ 47} Appellant has raised the following four assignments of error in his consolidated appeal:
 {¶ 48} "I. APPELLANT WAS DENIED A FAIR TRIAL WHERE, CONTRARY TO R.C. 2907.02(D), EVID.R. 402, EVID.R. 403(A) AND EVID.R. 404(B), THE TRIAL COURT PERMITTED THE STATE TO INTRODUCE UNFAIRLY PREJUDICIAL TESTIMONY AND EVIDENCE CONCERNING APPELLANT'S PRIOR CONVICTION FROM TEN YEARS EARLIER AND ALLEGED OTHER ACTS FROM MORE THAN TEN YEARS EARLIER.
 {¶ 49} "II. APPELLANT'S CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND THE JURY'S VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 50} "III. APPELLANT'S MAXIMUM AND CONSECUTIVE SENTENCES WERE ERRONEOUSLY IMPOSED PURSUANT TO UNCONSTITUTIONAL SENTENCING PROVISIONS, WHICH REQUIRED THE TRIAL COURT TO MAKE JUDICIAL FINDING OF FACTS NOT PROVEN TO A JURY BEYOND A REASONABLE DOUBT OR ADMITTED BY APPELLANT, AND THOSE SENTENCES MUST BE RESERVED AND REMANDED PURSUANT TO STATE v. FOSTER (2006), Ohio St.3d,2006-Ohio-856.
 {¶ 51} "IV. THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE THAT ALLEGED VICTIM LEE FOSTER LIED UNDER OATH DURING CROSS EXAMINATION WHEN HE DENIED STEALING A FIREARM FROM HIS AUNT AND UNCLE, WHERE LEE FOSTER'S CREDIBILITY WAS A KEY ISSUE AFFECTING THE OUTCOME OF TRIAL."
 I. {¶ 52} In his first assignment of error appellant maintains that he was denied a fair trial by the trial court's decision to admit evidence concerning his 1994 conviction for gross sexual imposition and other acts testimony concerning sexual abuse of Jeb Weikle and Ed Roof. We agree.
 {¶ 53} Initially, we note that the decision to admit or exclude relevant evidence is within the sound discretion of the trial court. State v. Bey (1999), 85 Ohio St.3d 487, 490,709 N.E.2d 484, 490. The trial court's decision to admit or exclude relevant evidence cannot be reversed absent an abuse of that discretion. See, e.g., State v. Combs (1991),62 Ohio St.3d 278, 581 N.E.2d 1071; State v. Sage (1987), 31 Ohio St.3d 173,510 N.E.2d 343; State v. Rooker (Apr. 15, 1993), Pike App. No. 483, unreported. The term "abuse of discretion" implies more than an error of law or judgment. Rather, the term suggests that the trial court acted in an unreasonable, arbitrary, or unconscionable manner. See, e.g., State v. Xie (1992),62 Ohio St.3d 521, 584 N.E.2d 715; State v. Montgomery (1991),61 Ohio St.3d 410, 575 N.E.2d 167. Furthermore, when applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. In re JaneDoe 1 (1991), 57 Ohio St.3d 135, 566 N.E.2d 1181 (citing Berkv. Matthews (1990), 53 Ohio St.3d 161, 359 N.E.2d 1301).
 {¶ 54} Evid.R. 404 sets forth a general bar against the use of character evidence. Of importance to the case sub judice,
Evid.R. 404(B) provides as follows:
 {¶ 55} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence or mistake or accident".
 {¶ 56} R.C. 2945.59 provides: "[i]n any criminal case which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with prior or subsequent thereto, notwithstanding with such proof may show or tend to show the commission of another crime by the defendant."
 {¶ 57} Section 2945.59 is to be strictly construed against the State, and to be conservatively applied by a trial court.State v. DeMarco (1987), 31 Ohio St.3d 191, 194,509 N.E.2d 1256.
 {¶ 58} The admissibility of other acts evidence is carefully limited because of the substantial danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged in the indictment. See State v. Curry (1975),43 Ohio St.2d 66, 68, 72 O.O.2d 37, 38, 330 N.E.2d 720, 723. This danger is particularly high when the other acts are very similar to the charged offense, or of an inflammatory nature, as is certainly true in this case. State v. Schaim, 65 Ohio St.3d 51, 60, 1992-Ohio-31, 600 N.E.2d 661,669.
 {¶ 59} The legislature has recognized the problems raised by the admission of other acts evidence in prosecutions for sexual offenses, and has carefully limited the circumstances in which evidence of the defendant's other sexual activity is admissible. The rape statute and the gross sexual imposition statute both contain subsections that address the admissibility of evidence of other sexual activity by either the victim or the defendant.Schaim, supra. (Footnotes omitted). Because of the severe social stigma attached to crimes of sexual assault and child molestation, evidence of these past acts poses a higher risk, on the whole, of influencing the jury to punish the defendant for the similar act rather than the charged act. Accordingly, the State may not "parade past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo." Huddlestonv. United States (1988), 485 U.S. 681, 689, 108 S.Ct. 1496.
 {¶ 60} Evidence of other acts is admissible if (1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. State v. Carter (1971),26 Ohio St.2d 79, 83, 269 N.E.2d 115, 117; State v. Lowe,69 Ohio St.3d 527, 530, 1994-Ohio-345, 634 N.E.2d 616, 619. (Citing State v.Broom (1988), 40 Ohio St.3d 277, 282-283, 533 N.E.2d 682,690-691; Evid.R. 404(B); R.C. 2945.59).
 {¶ 61} Further, the prior act must not be too remote and must be closely related in nature, time, and place to the offense charged. Schaim, 65 Ohio St.3d at 60, 600 N.E.2d at 669. A prior act which is "* * * too distant in time or too removed in method or type has no permissible probative value." State v.Snowden (1976), 49 Ohio App.2d 7, 10, 359 N.E.2d 87, 91; Statev. Burson (1974), 38 Ohio St.2d 157, 159, 67 O.O.2d 174, 175,311 N.E.2d 526, 529.
 {¶ 62} In the case at bar, the State's sole argument is that the testimony of Jeb Weikle and Ed Roof was properly admitted into evidence in order to show appellant's modus operandi.
 {¶ 63} Other acts may prove identity by establishing a modusoperandi applicable to the crime with which a defendant is charged. "Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B)." State v. Jamison (1990), 49 Ohio St.3d 182,552 N.E.2d 180, syllabus. "`Other acts' may be introduced to establish the identity of a perpetrator by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was used in the commission of the charged offense." State v. Smith (1990), 49 Ohio St.3d 137, 141,551 N.E.2d 190, 194; State v. Lowe, supra, 69 Ohio St.3d at 531,1994-Ohio-345, 634 N.E.2d at 629.
 {¶ 64} "Pattern" evidence refers to other acts evidence that is admissible when the defendant's scheme, plan, or system in doing an act is relevant at trial. Evidence of a defendant's scheme, plan, or system in doing an act can be relevant for two reasons: (1) the other acts are part of one criminal transaction such that they are inextricably related to the charged crime, and (2) a common scheme or plan tends to prove the identity of the perpetrator. State v. Curry (1975), 43 Ohio St.2d 66, 72-73, 72 O.O.2d 37, 41, 330 N.E.2d 720, 725-726.
 {¶ 65} In the factually similar case of State v. Eubank
(1979), 60 Ohio St.2d 183, 398 N.E.2d 567, the Supreme Court held that evidence similar to that introduced in this case was inadmissible. In Eubank, the defendant was charged with two counts of gross sexual imposition. The state's primary witness testified that, when he was twelve years old, the defendant had fondled his private parts in the living room of defendant's mobile home. The boy's credibility was severely attacked on cross-examination. Two other boys, who also spent the night with defendant, testified that they had no knowledge of any incident on the night in question. However, the state was subsequently allowed to call the two boys to testify that defendant had previously attempted to engage in sexual activity with them. On appeal, the conviction was reversed on the ground that the trial court had improperly allowed testimony of alleged other sexual acts of defendant. To that extent, the Supreme Court agreed with the appellate court, but reversed on the basis that, since the case was tried to the court and in view of the entire record, such error was harmless.
 {¶ 66} The court in Eubank stated that:
 {¶ 67} "`* * * "Scheme, plan or system" evidence is relevant in two general factual situations. First, those situations in which the "other acts" form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment. In such cases, it would be virtually impossible to prove that the accused committed the crime charged without also introducing evidence of the other acts. To be admissible pursuant to this sub-category of "scheme, plan or system" evidence, the "other acts" testimony must concern events which are inextricably related to the alleged criminal act. * * *
 {¶ 68} "`Identity of the perpetrator of a crime is the second factual situation in which "scheme, plan or system" evidence is admissible. One recognized method of establishing that the accused committed the offense set forth in the indictment is to show that he has committed similar crimes within a period of time reasonably near to the offense on trial, and that a similar scheme, plan or system was utilized to commit both the offense at issue and the other crimes.'" Id. at 186, 398 N.E.2d at 569. (Emphasis in original.)
 {¶ 69} In Eubank, the court found that the other boys' testimony was not necessary to establish the identity of defendant, nor was it introduced to establish a scheme, plan or system since:
 {¶ 70} "* * * [T]he `other acts' as claimed by the two young state's witnesses to have been carried out by the defendant were not inextricably related to the alleged criminal act subjudice. Those acts, if committed by the defendant, were chronologically and factually separate occurrences." Id. at 186. The court further noted that "it is not argued by the state that the perpetrator's identity was at issue. Therefore, we hold that the testimony of these two witnesses concerning other acts was not properly admitted to prove the defendant's scheme, plan, or system in committing the crime charged". Id. at 186,398 N.E.2d at 569.
 {¶ 71} In State v. Curry (1975), 43 Ohio St.2d 66,330 N.E.2d 720, the defendant was charged with statutory rape. The trial court allowed evidence that the defendant had molested an eleven-year-old girl subsequent to the date of the indictment. On appeal to the Supreme Court, the defendant argued that the trial court improperly allowed the introduction of the other acts testimony. The Supreme Court agreed, noting that the evidence was not admissible under the "scheme, plan, or system" exception. The court first concluded that the alleged other act did not form part of the immediate background of the crime charged.43 Ohio St.2d at 73, 330 N.E.2d at 725. The court stated that the crime at issue, statutory rape, and the alleged molestation were not "inextricably related," but were "chronologically and factually separate occurrences." Id.
 {¶ 72} The court next determined that the alleged other act was inadmissible to prove the defendant's identity because "identity was not a material issue." 43 Ohio St.2d at 72,330 N.E.2d at 726. The court noted that the defendant had not denied being present with the alleged victim, but instead denied sexual contact with her. Id. The court stated: "[t]his denial did not raise an identity question; it created, instead a factual dispute revolving around appellee's conduct with [the victim]." Id.
 {¶ 73} Like Curry and Eubank, the other acts evidence in the case at bar does not form part of the immediate background of the crime charged. The other acts admitted during appellant's case occurred over ten years before the acts alleged in the indictment. Thus, like Curry and Eubank, the other acts are not inextricably related to the crime charged, and are chronologically and factually separate occurrences. Whether appellant committed a crime is the crux of the dispute. If a crime did in fact occur, no dispute exists that appellant was the perpetrator. In other words, no dispute exists as to identity. As the identity of the person who had sexually abused the Foster boys was not an issue at trial, the other acts are not properly admitted to prove the appellant's scheme, plan, or system in committing the crimes charged. The record in this case makes clear that the State intended for the testimony concerning the sexual abuse of Jeb Weikle and Ed Roof to show that appellant had committed similar acts in the past. Indeed, that purpose was the only possible one for which the evidence could be offered. In the case at bar, the evidence was not submitted to establish the appellant as the person who had committed the acts of sexual abuse; rather the evidence's sole purpose was showing that appellant had a character trait of molesting young boys and that the appellant acted in conformity with his past behavior.
 {¶ 74} Accordingly, we hold that it was error for the court to admit testimony concerning other sexual acts of the appellant on the basis that those acts proved appellant's scheme, plan, or system in committing the crime charged.
 {¶ 75} We would additionally note that the quality of the evidence concerning the allegations made by Mr. Roof is lacking. In order for evidence of a prior act to be admissible, there must be substantial evidence that the accused committed the act.State v. Carter (1971), 26 Ohio St.2d 79, 269 N.E.2d 115. In the case sub judice, Mr. Roof did not tell anyone about appellant's sexual misconduct at the time the misconduct allegedly occurred. Moreover, no other witness testified at the trial about the prior incident. Further, no dates, locations, details or circumstances were provided by Mr. Roof. Mr. Roof testified that he knew of appellant's association with the two minors, and further that he smoked marihuana with the boys and appellant. Yet, Mr. Roof never thought it important enough to report his alleged past sexual abuse as a minor with appellant to the authorities to protect the boys from a similar experience. Uncorroborated and unsubstantiated evidence of this nature is fraught with danger and falls far short of substantial proof that appellant committed the prior act. As a result, the use of questionable evidence about appellant's past sexual misconduct to prove an element of an unrelated charge was not permissible. The appellant was left with absolutely no means of answering these allegations. State v. Henderson (1991), 76 Ohio App.3d 290,601 N.E.2d 596; State v. Strober (1988), 51 Ohio App.3d 31,554 N.E.2d 916.
 {¶ 76} We cannot say in good conscience that there was "no reasonable possibility" that the testimony of these witnesses did not contribute to the appellant's conviction or that the error was harmless beyond a reasonable doubt. See State v. Rahman
(1986), 23 Ohio St.3d 146, 151, 492 N.E.2d 401, 407. The admission of the `other acts' testimony constituted prejudicial error, and, hence, appellant is entitled to a new trial.
 {¶ 77} Accordingly, appellant's first assignment of error is sustained.
 II. III. IV. {¶ 78} In light of our disposition of appellant's first assignment of error appellant's remaining assignments of error are moot.
 {¶ 79} For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Richland County, Ohio, is reversed and this case is remanded for proceedings consistent with this opinion.
Gwin, J., Wise, P.J., and Boggins, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas, Richland County, Ohio, is reversed and this case is remanded for proceedings consistent with this opinion. Costs to appellee.